v. Minerva Surgical, Inc. v. Minerva Surgical, Inc. Thank you, Your Honor. May it please the Court, Matthew Wolfe for Hologic. In early 2004, Mr. Chukai and his colleagues filed the claims at issue with the Patent Office, the 183 patent. Six months later, for hundreds of millions of dollars, he sold that application as well as other technologies to Hologic. Four months after that, the claims issued, the very claims that Hologic had bought in the form they had bought them. Ten years later, Mr. Chukai... Let me ask you a question. Yes, Your Honor. On page 85 of the red brief, Minerva says the district court awarded no damages infringement of the 183 and you didn't appeal that decision. If that's true, why should we award supplemental damages for the 183 and no damages were awarded by the district court? Your Honor, we unambiguously did. I mean, that's issue three, I believe, from our appeal. We unambiguously did raise in numerous different ways the notion that if you agree with us and ask for a stop, the 183 damages would continue until either an injunction or the termination of the patent. Fair enough. Ten years later, Mr. Chukai and his new company, Minerva, infringes the very claims he sold us in the very form he sold them to us. $140 million, was it? Which thing? Was it $140 million? $325 million. Oh, $325 million. Sold it to us, and then when we sued him for infringing the patents he sold us, he filed an IPR. Now, this court has held that was within his right. What's not within his rights, what's not part of the changes wrought by the AIA is that he could avail himself personally in the private litigation between these two parties of the result of the IPR. And so the district court got it right, and in fact it's not appealed, that Asinor Estoppel applies in this case. All the circumstances apply in this case. That's not appealed, not disputed. Where the district court erred was in suggesting that because as to the rest of the world this patent is no longer enforceable or no longer valid, it is not valid as to this particular plaintiff or defendant in this case. That's of course the whole purpose of Asinor Estoppel is to uniquely position the Asinor of a patent and say you, and you alone, because you've already earned money from this patent, principles of equity and law, and it's interesting. I mean the Diamond Scientific case, and this may or may not be relevant to this appeal, the Diamond Scientific case notes that Asinor Estoppel has one foot in equity and one foot in law in the analogy to Estoppel by deed. You uniquely, in this case Minerva, are not able to avail yourselves of the benefits of what happens. Is it that you're not able to avail yourself of the benefits or is it that you're not able to challenge the validity? You are stopped from challenging the validity of the patent in a district court. Your Honor, it was until the Arista case, both. Well, I understand. But now it's... Unfortunately, that ship has sailed. Yes. And that decision was based on the statutory language in the AIA. Correct. But now we... But that doesn't... The whole point of Arista, and Arista very carefully noted the competition between the branches of government and the tensions in form shopping. It did not say, because it would have been contrary to what it was trying to do, that if somehow a patent is invalidated in an IPR, that the Asinor can avail themselves. I mean, collateral Estoppel is a similar concept, right? Collateral Estoppel sometimes prevents you uniquely, the collateral Estoppel party, from being able to assert a fact in the world, a truth, a legal finding, a change in law, whatever it may be. The whole concept of Estoppel is, it may be true that the 183 patent is invalid. But that doesn't mean that you, Minerva, get to avail yourselves of that fact in a district court. Because the core of equity is on clean hands. That's one of the bases of the four. I think Diamond Scientific identified four bases for Asinor Estoppel. That was the first of the four they identified, Your Honor. That's exactly right. You know, when they said it's consistent, this is Arista at 804, that such a discrepancy between forms, one that follows from the lines of the respective statutes, is consistent with the overarching goals of the IPR process that extend beyond the particular parties in a given patent dispute. Well, now we are back with the particular parties in a given patent dispute. And in this case, the district court, having found that Asinor Estoppel existed, should have said that, as to Minerva, they cannot avail themselves of the benefits of that IPR result until November 2020. Or, as you know, we've argued for an injunction here. And unless there are further questions on the Asinor Estoppel issue, which I think is an important one, narrow, but an interesting issue of law, I'm going to move on to the injunction issue. As this court noted in Bosch, it is within your discretion, and it is entirely your discretion, whether you're going to skip the typical interim step, assuming you agree with us on the Asinor Estoppel, of sending it back for the district court to analyze the factors regarding the eBay factors, the four eBay factors. And what Bosch suggested is, when there's overwhelming evidence, and the clock is ticking, as it is in this case, because the patent expires in November 2020, you can, yourself, put the injunction in place. And we've laid out in the briefs, unless you have questions, I won't go through it. But it is as powerful an injunction case as there can be. It is an important but not essential feature. It was sold to us. They themselves minimized the benefits to their own product, while we say it's critical to ours, et cetera. That's all in the briefing. With that, the remaining damages issues are worth hundreds of thousands of dollars in and of themselves, of our appeal. But if you agree with us on the Asinor Estoppel issue, then they're worth millions and millions of dollars, which is why all those little issues at the end of our brief that may have seemed a bit nickel and dime, they're not, if you extend the damages period to November 2020. They are worth quite a lot of money. I want to ask you about one of those issues, which is the argument that the district court should have awarded enhanced damages. Yes. And the argument that the district court erred by not explaining, going through the read factors, and there was an abuse of discretion by not doing that. What I'm not seeing is where did the district court find that there was willful infringement post-verdict? I understand that this is the jury found there was no willful infringement for pre-verdict activity. Right, right. And now you're arguing that there was willful infringement post-verdict activity. Where does that fact finding come from? It doesn't. The court didn't get there. The court said because the patent is what the IPR killed the 183, and as to the 348, there's only a few months. So the court just basically said, I'm not going to deal with it. So there was no fact finding. We're not suggesting that. Including no fact finding on willfulness. Correct. How can you have enhanced damages if there's no finding of willful infringement? Well, there's actually a dispute, as you know, Your Honor, about whether exceptional case and that kind of thing requires a finding of willfulness. But putting that aside, we think that there should have been an analysis of willfulness. Did you argue for that? When you said, you know, we think you should increase or enhance the royalties. That's baked into the Reed factors, a number of those Reed factors. Willful infringement isn't decided under Reed. Reed is the standard for determining the amount of enhancement after there's been a finding of willful infringement. But, Your Honor, I think post, and I may be wrong on this, and maybe there's a case I'm missing, but post-jury verdict willfulness, there's no one to go back to because it's a jury that decides willfulness. There's no one to go back to. So Reed, a number of the factors deal with the state of mind, the intent, the motivation, the clean mind and clean hands of the defendant. So I think that Reed supplants a willfulness finding in a post-verdict context. Okay. So here the jury found there was no willful infringement pre-verdict. Correct. You're saying that our case law supports the idea that the district court should look to Reed to determine whether there's willfulness post-verdict. Right. If you continue, if you're found to infringe. Should they change the product post-verdict? Actually, this is the issue of that pivot handle. Yeah, yeah. But, I mean, if they changed it, it certainly would undermine the willfulness. Yes, you would, Your Honor. That's why I was asking. Yes, Your Honor. And that would require, that would be like a colorably distinct analysis by the district court under an injunction. On the facts of this case, did the judge know that they changed the product? They. Allegedly changed the product? Yes and no. They said it was a prototype. At the time of trial, Mr. Chakai said he didn't even know about it. They're CEO. You're talking about what the judge knew about it. We don't know. We don't know what the judge said. He ordered damages through the expiration of the 348 patent. He asked for a complete decounting, which would suggest that he either didn't know or didn't think it was not infringing. But then we have where he actually, when he got to the dollar amount, he backed it out. We just don't know, Your Honor, is the answer. We just don't know. And with that, I reserve the rest for unless there are further questions for the cross appeal. Good morning, Your Honors. May it please the court. Rob Hockman from Minerva. My intention in the limited time I have today is to address two issues that we think dispose of this whole case. One, in Halogic's appeal, the question about the mootness of the 183 claim and why a sign or estoppel does not undo that, has no impact on that, and can't affect that. So no relief, including injunctive relief, is warranted for any infringement of the so-called 183 patent. Let me ask you a question. Yeah. On page 17, footnote 1 of the yellow brief, Halogic says the district court also undoubtedly made a typographical error in the final judgment. Do you agree with him on that? No. This has to do with damages down, with the calculation of interest. And it was just a date that was selected by them and that they put in front of the district court. And the district court just adopted it. That's all. Focusing on the 183 patent, the other issue, by the way, that I want to be sure to get to, has to do with the applicator-head claim construction in our appeal on the 348 patent. So starting with the 183 patent, Your Honor, the district court determined the claim is moot. And that's right. Because that's what X, Y, and Fresenius say. And Fresenius roots this doctrine way back. It's a 160-year-old Supreme Court precedent. Fresenius marched through the changes to the patent statute, all of which make clear that when the patent office takes away a patent. Right. But Fresenius is not dealing with signer estoppel. Right. Take your adversary's argument on its face for what it's worth. And he says, yeah, Fresenius applies to everybody in the whole world, anybody else that they had a lawsuit going against. Even if they had a judgment, if it hadn't been executed, they're screwed. It's all over. But guess what? For this particular case, there's a different rule. That's what he's saying. Yeah. And here's why that's wrong, Your Honor. Because Fresenius says there's no cause of action. It's extinguished. It's void ab initio. These are quotes from Fresenius. Their claim is void ab initio. Now let's go to Diamond Scientific and let's look at what a signer estoppel is. Wait. When I'm talking, you don't. Sure. Or any of the judges. Yeah. What if your client cannot assert that? Well, I'll get to that in a second because I think that XY says it can actually be raised sua sponte. So we don't have to assert that. We did, obviously, and it was proper for us to. No, what if you can't assert Fresenius? But we can assert it because Diamond Scientific doesn't take that away from us. It doesn't take away the ability to say they don't have a cause of action. What Diamond Scientific says is a signer estoppel, as Judge Stoll suggested, is about signers being estopped from defending patent infringement claims. That's a quote. Defending patent infringement claims by asserting invalidity. As of the date that this court affirmed the IPR ruling that the patent is invalid, we were not defending a patent infringement claim. The patent infringement claim was, in the language of Fresenius, void, ab initio. We were not asserting. We didn't get a judgment of invalidity. We were not at that point to prevail. We didn't have to assert invalidity. All we had to do was say the claim is moot, and that's the judgment we got. We didn't get an invalidity ruling. How can you say we're estopped from getting the judgment we got when the only thing we're estopped from getting. You're defending their claim by saying the claim doesn't exist. The claim doesn't exist. That's the difference. We are not saying, district judge, give us a judgment of invalidity. That's already been done through a proceeding that this court has said is proper, and that's the end of the matter. What if you're barred from saying the claim doesn't exist? Well, that would be a different doctrine. That would be a dramatic expansion of a signer estoppel, because then a signer estoppel would not be just an estoppel of a defense of invalidity in a patent infringement claim. It would be the reviving of a cause of action itself, and that would be wholly novel, completely expansive, well beyond the range of even the traditional signer estoppel. And I understand how logic takes the view that we have not a challenge to signer estoppel in this case. In fact, we have. We've made clear, and opinions from this court have made clear, that a signer estoppel is a questionable doctrine, but at a minimum, at a minimum, it's not a doctrine that warrants that kind of dramatic expansion. You asked us to overrule a signer estoppel, right? Yes, we have. That is correct. So it would be a dramatic difference in the law of a signer estoppel to say that it revives a cause of action that, as Fresenius said, is void ab initio. They have no claim, and because they have no claim, they have no right to any relief, and so you don't even have to figure out how the eBay factors could possibly be applied in this bizarro situation where you have a dead patent, but they're claiming that there's some great public interest that's being served by enforcing it. And at the end of the day, I just want to emphasize, this is really critical, this patent died. They lost the ability to enforce it against anyone. The problem they really have is with Arista. That's clearly their problem. They never say anything about Fresenius and the consequences of an affirmance of an IPR that the claim is extinguished, void ab initio. As XY said, this can be raised sua sponte by the court. If it's an estoppel against us, how could the extinguishment of the claim be raised sua sponte by the court? Well, it could be, but that's an interesting question because the court didn't raise it. Well, and the court did. The court determined that this case is moved, and on that basis, you can affirm. Let me turn to the applicator head. Before you do that, because time is going to run out, I'm not sure I understand your challenge to the royally award of $587,000. Is the mistake here a failure to specify which of the two patents the award goes to? Or is it a failure below to apportion value as to the patents? It was a failure to apportion, Your Honor. Apportion as to the ones. Yeah, and what I mean is apportion value as to the two different patents. There were two patents put before the jury. The district court agreed that you can't get anything for the 183 and said, but that's fine. We'll just dump it all into the 348. Okay, so I have a question for you on that, too. So I think that their expert, I think, was Dr. Berry, Mr. Berry. He has testimony at 30439 where he says whether the first patent's infringed or the second patent's infringed, 10% royalty. He says they both can be infringed. One can be infringed. The other one can be infringed. 10% royalty is the reasonable royalty. Then there was no jury instruction. As the district court judge said, there was no evidence provided for apportionment. And so there was no reason to instruct the jury to apportion in this way between the two patents. Instead, HoLogic's expert said it's 10% no matter what, same royalty rate no matter what because it's the same accused devices. So my question to you is this. Is there any other evidence in the record on this apportionment where you explained why it was that HoLogic's expert was wrong? Well, the evidence that matters is that we asked for a jury instruction that said divide, tell the jury to value the patents separately. That was refused. And once that's refused, they do have evidence. They have a statement. But we don't know what the jury thought. And there's good reason to believe that we just don't know. And the we don't know is a problem enough. I hear you. But assuming that my question is valid, what is your answer to my question? Did we put on evidence that the patents are differently valued? Yeah, like did your damages expert explain there could be a different rate? Hey, if you find one patent infringed, it should be different. Is Mr. Berry's testimony undisputed? I don't recall anything specific about that as I stand here. But I would like to have the opportunity to submit something post-argument if something doesn't come up. We should treat it as undisputed. Well, it's not that it was undisputed. Either you can point to something that disputes what the expert said or you can't. And you said you can't, so we've got to decide the case. Right, but my point is to the extent it was undisputed is because we didn't get the instruction we wanted. So you didn't get the instruction. So what? Wait a second. You got the cart before the horse. If there's no evidence, why should the court give a jury answer? No, no, there's evidence in the record that these patents are differently valued substantially. Our damages expert said that. The question is whether at trial, I don't remember whether at trial when we didn't get the instruction we wanted. Evidence before the jury. That's what we're asking about is evidence before the jury. Please don't interrupt me. The district court said, I'm not going to give you the instruction because there was no evidence that anything had to be apportioned provided to the jury. How in the world are they going to apportion when nobody told them how to do that? So I am confident that our damages expert said that the two patents, which are completely different technologies, have to be valued differently. I'm confident. I just don't recall. I don't have the page number right now. With all due respect, you're now making an argument on what you think is in the record. It's too late. The issue is in front of us. Your adversary has said your argument on this point loses because we had our expert testify that it's 10% jury sent A either way. And your response to that is judge didn't give an instruction. That argument has just been thrown under the bus. You're going to get a chance to stand up again. We'll see if we can find it, but I'm confident that these are very different technologies. It's your responsibility to tell us. I will find it. What I want to use as quickly as possible, because I know I'm running out of time, the 348 patent claim construction. We obviously have an invalidity argument that follows on this as well, but I want to emphasize the claim construction. This is a dramatic claim construction error, and it would really require unwinding years of this court's claim construction law to affirm this claim construction ruling. The applicator had, or as it's referred to in the patent specification in various places, the electrode array, is said to be fluid permeable. The electrode array includes a fluid permeable elastic member. That's the summary. The abstract says essentially the same thing. The title. They're asking you to read this patent, which is titled Moisture Transport System. Why did they say it was preferably permeable? Let's go through that passage. That's appendix 162. You know what I'm talking about. Yeah, appendix 162, column 5. Let's read it. The electrode carrying means, that's the applicator had, is, and it's going to talk about three characteristics. This is column 5, 52 to 56. Electrode carrying means is, one, preferably a sack formed of material which is nonconductive. So it's preferably nonconductive, which is permeable to moisture. Not preferably permeable to moisture. Is permeable to moisture. That's two. And three, which may be compressed to a smaller volume. Maybe. So that's optional. So it's preferably nonconductive. It is unqualifiedly permeable, which is exactly what's said in the abstract and in the summary and in the title. And it may be compressed to a smaller volume. So compressibility is optional. Your view is that even though the plain claim language doesn't have that permeable aspect, we should read it in because it should be clear from the specification that it's so important that it's almost a disclaimer not to have it. Absolutely. That is exactly our view. It is exactly the view that prevailed in Ultimate Pointer. It is exactly the view that prevailed in Ruckus. It is exactly the view that prevailed in Barkon Wireless. You don't need an express disclaimer. What would an express disclaimer mean? We're into your time. Yeah, I understand. What would an express disclaimer mean? The electrode array includes a fluid permeable elastic member, comma, which is not permeable. I mean, it says fluid permeable. It would be redundant. This is the clearest case you can have. And you cannot affirm this case without undoing Ultimate Pointer, Ruckus, and Phillips itself. You have to do this process where you sit there with a dictionary and ignore the specification. And the clarity here is overwhelming. And it's as strong as in any case. And it's so strong, I also urge, Your Honors, to please consider when you remand this case, that you remand with instructions to enter judgment of no infringement on the 348 patent, not for further proceedings. That's what you did in Eon, in Footnote 3. This case is just as clear. Our device can't work if it's not impermissible. If it's permeable. Our device can't work. It would be dangerous to the patient if argon gas leaked. The system would fail. It wouldn't ignite the argon gas if moisture came in. The whole system doesn't work. And the testimony on that is clear, as well as the manual at 15968. If the balloon can't hold the gas, you've got to throw the device away. There's no ambiguity about that. So we strongly urge that you enter judgment in our favor of no infringement on the 348 patent and affirm the judgment of mootness. And I'll reserve the remainder of my time. Counsel just read you four or five statements about the electrode array. The problem is the electrode array isn't the term that's being construed. The term in the claim is applicator head. The term applicator head is used 63 times in the specification. Not once in those 63 times is the applicator head said to have anything to do with the moisture removal or the permeability or all the different features they want to read in. So their entire argument is look at what's said about the electrode array. We're going to find that equals definitional level lexicography, which we disagree with in and of itself. But now we're going to say electrode array is synonymous with applicator head and so it must be used to define applicator head, notwithstanding the fact that electrode array is used sometimes in the patent is a different thing, is a different part. Applicator head, 63 times. And sometimes it says things about the applicator head. It says it includes flexures, for example, which theirs, of course, does. So this is simply sleight of hand. I mean, putting aside whether it reaches the level of lexicography or disclaimer, they're defining the wrong term. So unless there are other questions in applicator head, I'll move back to the issue of Aston or Estoppel and address briefly that point with that. Counsel use some very strong language to describe our position. Bizarro world, things like that. I would note that this exact issue has been addressed, albeit by a district court, not this court, but in the AmFens case, this is 710F sub 42. This was in the reexam. The court said, even if upon reexamination the U.S. Patent Office finds that the 423 patent is invalid, the defendants will be unable to assert that finding because the doctrine of Aston or Estoppel prevents them. So again, we're not arguing that that's binding on this court, but the District of Connecticut did not find this a bizarro proposition that we're proffering to you today. In fact, it founded the natural evolution of Aston or Estoppel. And to Judge Stoll's very apt point about the two different components, what Arista said is you can't assert it. One benefit of Aston or Estoppel would have been pre-AIA for us to say to Minerva, you Minerva, you can't kill our patent vis-a-vis the rest of the world. Your hands are tied. You can't do an IPR. That's not allowed. And what Arista said, and respectfully I disagree, but it's the law of the land, no, they can do that for the benefit of the public. But nothing Arista said or Mentor or Mag or any other case said that the second effect, that the unique Aston or position that they are in, that that is somehow abrogated. There's nothing in the statute that dictates that. There's nothing in the case law that dictates that. And as I've shown you, district courts have already anticipated what the natural import of that is. And unless there are further questions, I will take my seat. What's your response to your adversary's argument on the desire to enhance and enlarge the royalty award? In what sense, Your Honor? I'm sorry. Well, I mean, you heard what we said, and we were giving your adversary some questions about the fact that your expert came on and said 10 percent, 10 percent, 10 percent, no matter what. Yes. So, Your Honor, what the expert said, and Judge Stoll, and he said it multiple times, and there's multiple places, is we have a method claim and a system claim. And that, from a licensing perspective, in the hypothetical negotiation, and he went through the factors, it would be 10 percent. And you wouldn't disaggregate. No one would pay 20 percent. He wasn't arguing that you should stack them. But that if you want to practice one or the other, they're both important, they're both integral, one's method, one's system, they go forward. What their expert got up and said is, our rate's too high. He didn't say our rationale was wrong. He said our rate's too high. I would do lower than that. And you know what? Jury partly agreed with him. We asked for 10 percent, the jury gave 8 percent. So the jury followed, I mean, this is kind of precisely the way damages are supposed to work. The jury followed that approach. When they turned around and asked for specific instruction, Judge Battalion quite rightly said, where is the countervailing expert testimony that would justify it? Otherwise, you're just going to confuse the jury and have them go back in that room looking for evidence that doesn't exist. So it's your view that there was no evidence presented by Minerva's expert explaining why apportionment would be necessary? Right. Their argument was lower, not disaggregated. And with that, Your Honors, thank you for your time. Thank you, counsel. Just on starting with the 183, this is Mentor graphics at the back. For example, contrary to the suggestion of Mentor's counsel at argument, a sign or estoppel does not preclude the estopped party from arguing that the patentee itself is collaterally estopped from asserting a patent found invalid in a prior proceeding. That's this Court's decision. So the notion that Am Fence somehow overrides a 1998 decision of this Court is unsustainable. He says that we're not talking about the applicator head when we point to all of the places where it talks about the need for permeability of the electrode array and the applicator head. But what he doesn't say, what he can't say, what he's... You softly said, and the applicator head. You pointed to the... Yeah, well, what I'm saying is that the electrode array is often referred to as the component that is referred to in the claim as the applicator head. That's my point. What he can't point to and has never pointed to is any place in the specification where it refers to the applicator head or the electrode array as being permeable because this is a moisture transport system. That's the title. Your Honors, he's asking you to write an opinion that says the moisture transport system. And he said this. One of the problems with your argument, to be honest with you, is that you have nothing in the claim that says permeable. But that was true of ultimate pointer. I understand. The claim language in ultimate pointer was just as unqualified. Handheld device, a computer handheld device, could be direct pointing device like a wand or it could be a mouse. And this Court there very clearly went through and said every time it refers, it refers only to direct pointing. Same here. Every time it refers to permeability. It's only permeable, not impermeable. I just want to answer the question. I want to, yeah. Do you have evidence for me on the apportionment? What we would point to at this point is appendix page 31961 to 64. What? Slow down. Oh, sorry. What is it? Appendix page 31961 to 64. 31961? Yeah, to 64. And what's that show? And what that's going to show, Your Honor, is why. So that, in fact, the rejection of the instruction that was given, Your Honor, was not because there wasn't evidence of distinction, but because the Court determined that Hologic just got to choose its preferred way, apportionment or not. And we said. Your argument was to the rate, not to the apportionment. But what I think it's going to show there is that the district court's rationale was unlinked to any dispute that we had shown that we had different valuations for these different facts. I've read this. Oh, OK. And on page 31961, the Court says, quote, how would they do that? There has been no testimony on what the split is because they didn't put an expert to tell them. And, I mean, but they did put out an expert, which we already talked about earlier, to the extent that that is Hologic. Mm-hmm. Yeah. So he did say how there's no evidence. There has been no testimony. But that wasn't ultimately his choice was to leave. Our point is that, again, I don't have a citation at this time to our damages experts on distinction between the two patents. And so I'll just leave it at that because I don't want to mislead the Court. I don't want to leave the Court with any impression. And ultimately, I want to emphasize I don't think the Court has any reason to reach any of these damages issues because we're entitled to judgment on the 348 and the judgment of which should be affirmed on the 183. Thank you. The matter stands submitted. Thank you.